Christina C. Sharp (SBN 245869)
Jordan Elias (SBN 228731)
Adam E. Polk (SBN 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| BRIAN A. KAWAHARA, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| HEADWAY TECHNOLOGIES, INC., HUTCHINSON TECHNOLOGY INC., MAGNECOMP PRECISION TECHNOLOGY PUBLIC CO. LTD., NAT PERIPHERAL (DONG GUAN) CO., LTD., NAT PERIPHERAL (H.K.) CO., LTD., NHK SPRING CO. LTD., NHK INTERNATIONAL CORPORATION, NHK SPRING (THAILAND) CO., LTD., SAE MAGNETICS (H.K.) LTD., AND TDK CORPORATION, | |
| Defendants. | |

Brian A. Kawahara ("Plaintiff"), on behalf of himself and all others similarly situated (the "Class" as defined below), brings this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust and unfair competition laws. Plaintiff demands a trial by jury and alleges as follows.

I.   **NATURE OF SUIT**

1.      This is an action against manufacturers of hard disk drive ("HDD") suspension assemblies for engaging in an anticompetitive conspiracy from at least 2008 to 2016 that artificially raised the price of external hard drives and other end-products that Plaintiff and millions of other Americans purchased. Defendants and their subsidiaries collectively control over 95 percent of the worldwide market for HDD suspension assemblies. Defendants were motivated to—and did—conspire to fix, maintain, and stabilize the prices of HDD suspension assemblies because prices otherwise would have fallen, reducing Defendants' profits, due to declining demand for these products over the course of the Class Period. Defendants also entered into illegal agreements to allocate HDD suspension assembly markets and customers. Defendants' anticompetitive agreements injured Plaintiff and other indirect purchasers of products containing these components, and they seek relief through this action.

2.      HDD suspension assemblies are a key component of HDDs, which store information electronically. HDDs rely in part on recording heads to read from and write to spinning disks. HDD suspension assemblies hold the recording heads close to the disks and maintain the necessary electrical connection between the heads and the product's circuitry. HDDs containing HDD suspension assemblies are both sold as standalone devices and incorporated into many other consumers electronics, such as computers and video-game systems.

3.      The United States Department of Justice has been investigating Defendants' illegal conspiracy since 2016. On July 29, 2019, NHK agreed to plead guilty and pay a $28.5 million fine for its participation in the conspiracy that underlies Plaintiff's claims. The Japanese Fair Trade Commission, after raiding offices of NHK and TDK, also issued a cease-and-desist order, fining them nearly $10 million and finding that they restrained competition in the market for HDD suspension assemblies through a horizontal agreement to maintain sales prices.

1

CLASS ACTION COMPLAINT
CASE NO.

## II. JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

4. The Court has federal subject matter jurisdiction under Section 16 of the Clayton Act, 15 U.S.C. § 26, based on Plaintiff's equitable relief claim against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

5. The Court also has diversity jurisdiction under 28 U.S.C. §§ 1332(d) and 1367 because this is a class action in which the amount in controversy is in excess of $5,000,000, excluding interest and costs, and in which some members of the proposed Class are citizens of a state different from some Defendants.

6. This Court has personal jurisdiction over Defendants because each, directly and/or through its ownership or control of subsidiaries: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of HDD suspension assemblies throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States, including this District; and/or (d) engaged in anticompetitive acts that were directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of injuring, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

7. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside and/or do business in this District.

8. Assignment to the San Jose Division is appropriate under Local Rule 3-2(c) because Defendant Headway Technologies, Inc. maintains its primary place of business in Milpitas, California and a substantial part of the conduct at issue in this case occurred in Santa Clara County.

CLASS ACTION COMPLAINT
CASE NO.

III.    **PARTIES**

    A.    **Plaintiff**

    9.    Plaintiff Brian A. Kawahara is a citizen and resident of Santa Cruz, California. He purchased a finished product containing an HDD suspension assembly on September 30, 2010 from Newegg.com.  The product was shipped from California and delivered to him in California.  Plaintiff has been injured in California and is threatened with further injury as a result of the violations alleged in this complaint.

    B.    **Defendants**

        1.    **NHK Defendants**

    10.    Defendant NHK Spring Co., Ltd. ("NHK Spring") is a Japanese corporation that maintains its principal place of business at 3-10 Fukuura, Kanazawa-ku, Yokohama, 236-0004, Japan.  During the Class Period, NHK Spring manufactured, marketed, sold and/or distributed HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

    11.    Defendant NHK International Corporation ("NHK International") is a U.S. subsidiary of NHK Spring that maintains its principal place of business at 46855 Magellan Drive, Novi, MI 48377.  During the Class Period, NHK International supplied and/or sold HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

    12.    Defendant NHK Spring (Thailand) Co., Ltd. ("NHK Thailand") is a subsidiary of NHK Spring that maintains its principal place of business at Bangna Tower A, 6th-7th floor 2/3 Moo 14, Bangna-Trad Rd., (km. 6.5), Bangkaew, Bangplee, Samutprakarn 10540 Thailand. During the Class Period, NHK Thailand manufactured and/or supplied HDD suspension Assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

    13.    Defendant NAT Peripheral (Dong Guan) Co., Ltd. ("NAT DongGuan") is a subsidiary of NHK Spring that maintains its principal place of business at Conrad Hi-Tech Park,

CLASS ACTION COMPLAINT
CASE NO.

Shangsha, ZhenAn  Road, ChangAn  Town, Dongguan, Guangdong, 523830 China.  During the Class Period, NAT DongGuan manufactured and/or supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

14.     Defendant NAT Peripheral (H.K.) Co., Ltd. ("NAT H.K.") is a subsidiary of NHK Spring that maintains its principal place of business at Suite 15b-17, 9/F, Tower 3, China Hong Kong City, 33 Canton Road, T.S.T., Kowloon, Hong Kong.  During the Class Period, NAT H.K. manufactured and/or supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

### 2.     TDK Defendants

15.     Defendant TDK Corporation ("TDK") is a Japanese corporation that maintain its principal place of business at 2-5-1 Nihonbashi, Chuo-ku, Tokyo, 103-6128, Japan.  TDK has a California-based division located at 1745 Technology Drive, Suite 200, San Jose, CA 95110.  During the Class Period, TDK manufactured, marketed and/or sold HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

16.     Defendant Magnecomp Precision Technology Public Co. Ltd. ("MPT") is a Thailand-based subsidiary of TDK that maintains its principal place of business at 162 M.5 Phaholyothin Road, T. Lamsai A. Wangnoi, Ayutthaya 13170, Thailand.  During the Class Period, MPT manufactured, marketed and/or sold HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

17.     Defendant SAE Magnetics (H.K.) Ltd. ("SAE Magnetics") is a subsidiary of TDK that maintains its principal place of business at 6 Science Park East Avenue, Hong Kong Science Park, Hong Kong, China.  During the Class Period, SAE Magnetics manufactured and/or supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

18.     Defendant Hutchinson Technology Inc. ("Hutchinson") is a Minnesota corporation that maintains its principal place of business at 40 West Highland Park Drive NE, Hutchinson, MN 55350.  TDK acquired Hutchinson on October 6, 2016.  During the Class

Period, Hutchinson manufactured, marketed and/or sold HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

19.     Defendant Headway Technologies, Inc. ("Headway") is a Delaware corporation wholly owned by TDK that maintains its principal place of business at 682 South Hillview Drive, Milpitas, CA 95035.  Headway employs approximately 800 people in engineering, manufacturing and administration roles in Milpitas.  During the Class Period, Headway manufactured and/or supplied HDD suspension assemblies, either directly or indirectly through its subsidiaries or affiliates, to customers in the United States.

## IV.     CO-CONSPIRATORS AND AGENTS

20.     Defendants' anticompetitive and unlawful acts were authorized, ordered, or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' business or affairs.

21.     Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged in this complaint and may have performed acts and made statements in furtherance of such violations.

22.     Each Defendant acted as the principal, agent or joint venturer of, or for, other Defendants with respect to the acts, violations, and course of conduct alleged in this complaint.

23.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged in this complaint were consensually formed between the Defendant principals and agents.  Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals.  Defendants' agents acted under the explicit, implied, or apparent authority of their principals.  These acts include subsidiaries selling, distributing, or shipping HDD suspension assemblies at the request of their parent companies.  Further, Defendants acted on behalf of and were subject to the control of their principals, and they acted within the scope of authority or power delegated by their principals.  Defendants' agents performed their duties within the scope of their agency, in

selling, distributing, or shipping HDD suspension assemblies that were sold at supracompetitive prices.

24.     Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied, or apparent authority

**V.    FACTUAL ALLEGATIONS**

**A.     HDD Suspension Assemblies Are Essential to the Functioning of HDDs.**

25.     An HDD is a hardware device that permanently stores and retrieves digital information.  HDDs can be external or internal and store such content as documents, pictures, music, videos, programs, application preferences, and operating systems.  HDD usage covers four general market segments: desktop HDDs, mobile (laptop) HDDs, enterprise HDDs, and consumer electronics HDDs.

26.     During the Class Period, over four billion units of HDDs were shipped worldwide.

27.     HDDs rely on magnetism to write, retrieve and store information electronically. HDDs are sold as stand-alone, external hard drives and also are incorporated into a broad range of electronic products, such as computers and video-game consoles.

28.     HDDs rely on, among other components, (a) spinning magnetic disks and (b) magnetic heads over the disks that read and write the information contained on the disks.

29.     HDD suspension assemblies are another key component of HDDs.  HDD suspension assemblies hold the magnetic heads in position over the spinning disks and connect the heads electronically to the HDDs' circuitry.  Without an HDD suspension assembly, an HDD cannot operate.

30.     An HDD suspension assembly includes three subcomponents that are welded together: a base plate, a load beam, and a flexure.

31.     Defendants manufacture and sell HDD suspension assemblies to distributors, contract manufacturers, and original equipment manufacturers.  Those firms, in turn, incorporate

CLASS ACTION COMPLAINT
CASE NO.

HDDs suspension assemblies into HDDs, or products containing HDDs, that they manufacture and then sell to others, including consumers, down the distribution chain.

**B.     Defendants Conspired to Restrain Trade in the U.S. Market for HDDs.**

32.     From no later than May 2008 through at least April 2016, Defendants knowingly entered into illegal price-fixing and market allocation agreements and engaged in a conspiracy to eliminate competition in the market for HDD suspension assemblies sold in the United States.

33.     Defendants took overt acts in furtherance of their anticompetitive conspiracy. They engaged in frequent discussions and attended numerous meetings during which they exchanged sensitive information about pricing, output, and production capacity and reached agreements not to compete with each other in the sale of HDD suspension assemblies in the United States, to fix the prices of those products sold in the United States, and to allocate HDD suspension assembly market shares and customers in the United States.

34.     Defendants' exchanges of confidential information included the exchange of anticipated pricing quotes to HDD suspension assembly customers in the United States. Defendants used the exchanged pricing information to inform their negotiations with U.S. purchasers of HDD suspension assemblies.  As a consequence, those purchasers paid artificially high prices for HDD suspension assemblies and end-products incorporating these components also were sold at artificially high prices.

**C.     The DOJ and Other Governmental Agencies Are Investigating and Have Taken Enforcement Actions Against Defendants.**

35.     Law enforcement authorities in various nations have been investigating Defendants for such antitrust violations since at least 2016.

36.     In July 2016, the Japanese Fair Trade Commission ("JFTC") raided Defendants TDK and NHK based on suspicion that they and/or their subsidiaries had agreed to fix the prices of HDD suspension components.

37.     On February 9, 2018, the JFTC issued a cease-and-desist order to both Defendants, finding that they substantially restrained competition in the HDD suspension

CLASS ACTION COMPLAINT
CASE NO.

assemblies market by agreeing to maintain sale prices. The JFTC also fined the two companies in the amount of 1.1 billion yen, or nearly $10 million.

38.    The United States Department of Justice ("DOJ") has been investigating anticompetitive behavior in the HDD suspension assembly market since at least 2016.

39.    On July 26, 2016, Defendant Hutchinson received a letter from the DOJ seeking documents relating to the investigation and stated that it would fully cooperate with the DOJ's probe. At the time Hutchinson received the DOJ's letter, the Federal Trade Commission was reviewing TDK's pending acquisition of Hutchinson.

40.    In April 2018, Brazil's competition-law authority, the Administrative Council for Economic Defense ("CADE"), opened an investigation into reports that Defendants conspired to suppress competition, including by fixing the prices of hard disk components. The Brazilian government is conducting an investigation into antitrust violations by Defendants Hutchinson, TDK, NHK Spring, MPT, and SAE Magnetics, at a minimum, as well as at least 38 individuals. The CADE stated that these companies may have "implemented" their anticompetitive agreements "through meetings and email exchanges, between 2003 and May 2016," and that "several" items of evidence show that "the companies divided the market and fixed prices in response to customer's quotation requests."

41.    On July 29, 2019, the DOJ charged NHK Spring with a single count of fixing the prices of HDD suspension assemblies. The DOJ accused NHK Spring and its co-conspirators of illicit activities that include the following:

- Engaging in discussions and meetings during which they reached price-fixing and market allocation agreements for HDD suspension assemblies sold in the United States;

- Exchanging HDD suspension assemblies pricing information, including anticipated pricing quotes, in the United States;

- Relying on their agreements not to compete and using the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD suspension assemblies for sale in, or delivery to, the United States;

CLASS ACTION COMPLAINT
CASE NO.

- Selling HDD suspension assemblies in, or for delivery to, the United States at collusive and supracompetitive prices; and

- Accepting payment for HDD suspension assemblies sold in, or for delivery to, the United States at collusive and supracompetitive prices.

42.     Also on July 29, 2019, NHK Spring pleaded guilty to the DOJ's charge and agreed to pay $28.5 million in criminal fines and to cooperate in the DOJ's continuing investigation.

43.     In announcing the plea, the DOJ stated that HDD suspension assemblies "are critical to the operation and performance of electronic devices, and their impact on American consumers and businesses is direct and substantial."

**D.      The HDD Suspension Assembly Industry Is Highly Susceptible to Collusion.**

44.     The characteristics of the HDD suspension assembly industry in the United States and elsewhere render this industry highly susceptible to price fixing and other anticompetitive behavior among manufacturers.

45.      Collusion is more likely in industries where: (1) the market is highly concentrated; (2) the dominant companies maintain close business relationships; (3) high barriers to entry exist; (4) the goods being produced are commodities; (5) demand is declining.  All of these economic characteristics distinguish the U.S. market for HDD suspension assemblies.

**1.      The HDD Suspension Assembly Industry Is Highly Concentrated.**

46.     Market concentration facilitates collusion.  Collusive agreements are easier to implement and sustain when there are few firms controlling a large portion of the market. Practical matters such as coordinating cartel meetings and exchanging information are much simpler with a small number of players.  If the participants can coordinate pricing decisions, their control over total industry output may result in prices that are elevated across the industry. Moreover, their high degree of control also simplifies their coordination issues because there is little outside competitive presence to undermine the cartel.  With fewer firms in the market, the transitory bump in profits that could be achieved by undercutting the cartel price and gaining a

CLASS ACTION COMPLAINT
CASE NO.

transitory increase in market share would be outweighed by the greater long-term market share for a colluding firm in a concentrated industry.

47.    By contrast, if an industry is divided into a large number of small firms, the current gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the cartel's continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully).

48.    The U.S. market for HDD suspension assemblies is highly concentrated. Throughout the Class Period, Defendants collectively controlled over 95 percent of the global market for HDD suspension assemblies.

49.    As of 2005, Hutchinson held approximately 55 percent of global market share and NHK Spring approximately 22 percent of global market share in the suspension assembly industry.  MPT, created through the 2005 merger of the Data Storage Division of Magnecomp International Ltd. and KR Precision Public Company, held approximately 20 percent of global market share in that industry.

50.    Market concentration further increased in 2007, when TDK acquired a majority stake in Thailand-based MPT.  This acquisition served to vertically integrate TDK's HDD suspension assembly business, which previously relied on independent component suppliers.

51.    By 2012, TDK, NHK Spring, and Hutchinson collectively controlled 96 percent of the global market for HDD suspension assemblies.

52.    In October 2016, TDK acquired Hutchinson.  As a result, TDK and NHK became the world's only two significant producers of HDD suspension assemblies, with TDK's market share rising to nearly 60 percent.

53.    As the HDD suspension assembly market is dominated by very few companies that control the lion's share of the market, their agreements and understandings to fix, raise, maintain and/or stabilize prices and to allocate market shares for HDD suspension assemblies

CLASS ACTION COMPLAINT
CASE NO.

were effective at maintaining the prices of these products at artificially high, supracompetitive levels.

### 2.    Defendants Maintained Close Business Relationships.

54.    Business relations among Defendants blurred the lines of competition, accustomed them to working in combination, and provided ample opportunity to collude.

55.    TDK, through its wholly-owned subsidiary SAE Magnetics, and NHK Spring maintained a joint venture to manufacture HDD suspension assemblies until March 2015.

56.    SAE Magnetics, in addition, was one of Hutchinson's top three customers throughout the Class Period.

57.    Defendants also cross-licensed each others' suspension assemblies and related technology throughout the Class Period.

58.    Furthermore, Defendants are geographically centralized, making collusion easy to accomplish.

### 3.    There Are High Barriers to Entry in the HDD Suspension Assembly Industry.

59.    The HDD suspension assembly industry has high barriers to entry that facilitate the formation and maintenance of a cartel.  Collusion between manufacturers that effectively increases product prices above competitive levels would attract new entrants seeking to benefit from supracompetitive pricing.  New entrants are less likely, however, where there are significant barriers to entry.

60.    There are substantial barriers that preclude, reduce, or make more difficult entry into the HDD suspension assembly market.  HDD suspension assemblies are expensive to manufacture.  Any potential new entrant faces costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, manufacturing plants and equipment, energy, distribution infrastructure, skilled labor, and longstanding customer relationships with existing manufacturers.

---

11

CLASS ACTION COMPLAINT
CASE NO.

61.    Defendants, moreover, own most of the patents relating to the manufacture of HDD suspension assemblies, and the risk of adverse consequences, including litigation costs, from infringing those patents deters other firms from attempting to enter this market.

62.    Demand for HDD products has declined over time, as other forms of data storage technology—for example, storage products using flash memory—have taken market share from HDDs.  This trend further lessens any motivation for a competing firm to attempt entry into the market for HDD suspension assemblies.

63.    For these reasons, as Defendant Hutchinson conceded, "the number of entities that have the technical capability and capacity for producing precision suspension assemblies or components in large volumes will remain small."

**4.    HDD Suspension Assemblies Are Commodity Products.**

64.    In economics, a commodity is a basic good used in commerce that is interchangeable with other commodities of the same type.  Commodities are most often used as inputs in the production of other goods or services.  Product homogeneity facilitates collusion more than product differentiation.  Homogenous products simplify the process among competitors of arriving at agreements on prices to charge and facilitate monitoring of those agreements.

65.    Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes such as product quality or customer service. This factor facilitates coordination because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where any observed differences in prices are more likely to reflect cheating on the conspiracy than any other factor which might affect pricing, such as special product characteristics, service or other aspects of the transaction.

66.    HDD suspension assemblies are homogenous and commodity-like by nature. Their characteristics and qualities are essentially uniform across different manufacturers. Although different sub-types of HDD suspension assemblies are not interchangeable, within each category the assemblies are designed to be interchangeable.

CLASS ACTION COMPLAINT
CASE NO.

67.    The homogenization of HDD suspension assemblies is aided by industry-standard product specifications.  The principal dimensions of product differentiation in HDD suspension assemblies are well known and easily quantifiable.

68.    As HDD suspension assemblies are commodities, price is the most obvious differentiation among them for purchasers.  In a market of this nature, with tens of millions of components being manufactured and sold a year at relatively inexpensive individual prices, there is a considerable incentive to fix, stabilize, maintain and raise the prices of the components to supracompetitive levels through illegal conspiratorial agreements.  By foregoing competition, each manufacturer could still guarantee itself massive profits in such a high volume market.  This anticompetitive conspiracy causes substantial harm to purchasers, to competition, and to U.S. commerce.

**5.    Declining Demand for HDD Suspension Assemblies Motivated Defendants to Protect Their Profits by Fixing Prices.**

69.    Declining demand generally creates an incentive for firms to collude because in a competitive market, prices fall when demand falls, and lower prices reduce profits unless manufacturers can cut costs.

70.    Demand for HDD products declined over the course of the Class Period as end-purchasers increasingly opted for forms of data storage technology other than HDDs.  Solid state storage and flash memory technology, among other technologies, provided alternatives to consumers and businesses in need of electronic storage.

71.    The demand for HDD suspension assemblies is correlated with the demand for HDDs because the former are necessary product components of the latter.  Thus, as demand for HDDs fell during the Class Period, so did demand for HDD suspension assemblies.  That trend, in turn, put downward pressure on HDD suspension assembly prices, threatening Defendants' already slim profit margins for these products.  Defendants, therefore, had a strong motive to collude to avoid competition and prop up prices through horizontal coordination.

CLASS ACTION COMPLAINT
CASE NO.

72.     To mitigate price erosion and counteract a decrease in profitability due to falling demand for HDD suspension assemblies, Defendants agreed to refrain from competing on price and to divide the market among themselves.

**VI.     ANTITRUST INJURY**

73.     Defendants' anticompetitive conspiracy had the following effects, among others:

    (a)     Price competition has been restrained or eliminated with respect to HDD suspension assemblies;

    (b)     The prices of HDD suspension assemblies have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    (c)     Indirect purchasers of HDD suspension assemblies have been deprived of free and open competition; and

    (d)     Indirect purchasers of HDD suspension assemblies, including Plaintiff, paid artificially inflated prices.

74.     By reason of Defendants' antitrust violations, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for HDD suspension assemblies than they would have paid in the absence Defendants' illegal contract, combination, or conspiracy, and have consequently suffered damages.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

75.     The markets for HDDs and HDD suspension assemblies are inextricably linked because the market for HDD suspension assemblies exists to serve the HDD market.

76.     HDD suspension assemblies are identifiable and discrete physical products that are unchanged when incorporated into an HDD.  HDD suspension assemblies followed a traceable, physical chain of distribution from the Defendants to Plaintiff and Class members, and costs attributable to HDD suspension assemblies can be traced through the chain of distribution to Plaintiff and Class members.

77.     Likewise, the prices of HDD suspension assemblies can be traced down the distribution chain to show that changes in the prices paid by direct purchasers of HDD

suspension assemblies affected the prices paid by indirect purchasers for HDDs containing HDD suspension assemblies.

78.    Unlawful overcharges for a component normally result in higher prices for products containing that component.  In this case, the unlawful overcharges for HDD suspension assemblies caused by Defendants' conspiracy were passed through to, and raised the prices paid by, end-purchasers of finished goods containing HDD suspension assemblies.

79.    Defendants' conspiratorial conduct aimed to raise, fix, maintain or stabilize the price of HDD suspension assemblies and, as a direct and foreseeable result, the price of products containing those components.

80.    The precise amount of the overcharge affecting the prices of products containing HDD suspension assemblies can be measured and quantified through standard econometric techniques, such as regression analysis, as applied to transactional data.

## VII.    TRADE AND COMMERCE

81.    At all material times, Defendants, directly or through one or more of their respective parents, subsidiaries, business units, agents or affiliates, sold HDD suspension assemblies in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

82.    At all material times, Defendants received funds, engaged in transactions, and transmitted contracts, invoices, and other forms of business communications in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of HDD suspension assemblies.

83.    At all material times, Defendants controlled virtually the entire global and U.S. market for HDD suspension assemblies.

84.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon U.S. interstate commerce.  Defendants' products are sold in the flow of interstate commerce, and the relevant activities of Defendants and their co-conspirators were within the flow of, and were intended to and did have a substantial effect upon, U.S. interstate commerce.  Defendants

CLASS ACTION COMPLAINT
CASE NO.

expressly aimed their conspiracy at the U.S. marketplace.  In furtherance of that conspiracy, Defendants employed U.S. and international telephone lines, as well as means of interstate and/or international travel.

85.    Defendants' unlawful agreement to fix prices and allocate markets affected commerce in each state.  Defendants' anticompetitive conduct has had substantial intrastate effects in that, among other things, such conduct deprived distributors, contract manufacturers, and original equipment manufacturers of access to more affordable HDD suspension assemblies that they could sell within each state, including as incorporated into finished goods.  Defendants' horizontal conspiracy to restrain competition in the market for HDD suspension assemblies has directly affected and disrupted commerce for end-purchasers within each state.

86.    HDD suspension assemblies manufactured abroad by Defendants and sold for use in products in the United States are goods brought into the United States for sale, and therefore constitute domestic or import commerce.  Defendants' price-fixing conspiracy had a direct, substantial and reasonably foreseeable effect on U.S. domestic commerce and proximately caused antitrust injury in the United States.

87.    By reason of the unlawful activities described in this complaint, Defendants' conduct substantially affected commerce throughout the United States, injuring Plaintiff and Class members.  Defendants, directly and through their agents, committed illicit acts affecting trade in all states to fix, raise, maintain and/or stabilize prices and to allocate markets and customers in the United States for HDD suspension assemblies.  Defendants' horizontal conspiracy is a per se violation of the antitrust laws.  It unreasonably restrained trade and adversely affected the U.S. markets for HDD suspension assemblies and the products containing them.  Defendants' conspiracy and wrongdoing caused economic harm to persons who purchased a product in the United States not for resale which included an HDD suspension assembly.

CLASS ACTION COMPLAINT
CASE NO.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VIII.   TOLLING OF THE STATUTES OF LIMITATIONS

### A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover His Claim.

88.     Plaintiff and Class members had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, during the Class Period and continuing thereafter.

89.     Plaintiff and Class member indirectly purchased HDD suspension assemblies manufactured by a Defendant.  They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this complaint during the Class Period.

90.     Throughout the Class Period, and continuing thereafter, no information in the public domain was available to Plaintiff and Class members that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for HDD suspension assemblies.

91.     It was reasonable for Plaintiff and Class members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior.

92.     Plaintiff alleges a continuing course of unlawful conduct by and among Defendants, including conduct within the applicable limitations periods, and that conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

93.     For these reasons, the statutes of limitations applicable to Plaintiff's and Class members' claims have been tolled with respect to the claims asserted in this complaint.

### B.   Fraudulent Concealment Tolled the Statutes of Limitations.

94.     Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on these claims.  Plaintiff and Class members had no knowledge of the combination or conspiracy alleged in this complaint, or of facts sufficient to place them on inquiry notice of their claims, during the Class Period and continuing thereafter. No information in the public domain or otherwise available to the Plaintiff and the Class during

CLASS ACTION COMPLAINT
CASE NO.

the Class Period suggested that any Defendant was involved in a criminal conspiracy to fix prices for HDD suspension assemblies.

95.    Defendants concealed their anticompetitive conspiracy by not disclosing that they were conspiring to fix prices, rig bids, and allocate markets.  Defendants' conspiracy also was inherently self-concealing because, as Defendants knew, its disclosure would have led to governmental enforcement activity, including potential criminal charges.  HDD products and components are subject to antitrust regulation, so it was reasonable for Plaintiff and Class members to assume that those products and components were being sold in competitive markets. Thus a reasonable person under the circumstances would not have had occasion to suspect that Defendants' HDD suspension assembly prices were artificially inflated at any time during the Class Period.

96.    Because the conspiracy was self-concealing and affirmatively concealed by Defendants, Plaintiff and Class members had no knowledge of the conspiracy or of any facts or information that would have caused a reasonably diligent person to suspect a conspiracy existed during the Class Period.

97.    For these reasons, the statutes of limitations applicable to Plaintiff's and Class members' claims were tolled throughout the Class Period, at a minimum.

## IX.    CLASS ACTION ALLEGATIONS

98.    Plaintiff brings this action on behalf of himself and as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and equitable relief on behalf of the following Class:

> All persons and entities who, during the Class Period, indirectly purchased in the United States a product not for resale which included one or more hard disk drive suspension assemblies manufactured or sold by a Defendant or by any co-conspirator or current or former subsidiary of a Defendant.

99.    The Class Period is initially defined as the period between May 1, 2008 and April 30, 2016.

CLASS ACTION COMPLAINT
CASE NO.

100.   Plaintiffs alternatively brings this action on behalf of himself and as a class action pursuant to Rules 23(a) and (b)(3) on behalf of the following Subclass (the "Repealer State Subclass"):

> All persons and entities who, during the Class Period, indirectly purchased a product in one of the Repealer States not for resale which included one or more hard disk drive suspension assemblies manufactured or sold by a Defendant or by any co-conspirator or current or former subsidiary of a Defendant.

101.   The Repealer States consist of the following jurisdictions, which, as of the date of this filing, expressly permit indirect purchasers to pursue damages based on violations of state antitrust and/or unfair competition law: Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

102.   Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, all judges assigned to this case, all jurors in this case, and all persons and entities who directly purchased HDD suspension assemblies from Defendants.

103.   While Plaintiff does not know the exact number of Class members, he is informed and believes there are millions of Class members.

104.   Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members.  The nature of Defendants' conspiracy rendered it applicable to all Class members, such that relief with respect to the Class as a whole is appropriate.  Such questions of law and fact common to the Class include, without limitation:

(a)   Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the prices of HDD suspension assemblies sold in the United States;

CLASS ACTION COMPLAINT
CASE NO.

1    (b)    The identity of the participants of the alleged conspiracies;

2    (c)    The duration of the alleged conspiracy and the acts carried out by

3    Defendants in furtherance thereof;

4    (d)    Whether the alleged conspiracy violated the Sherman Act;

5    (e)    Whether the alleged conspiracy violated the antitrust or unfair competition

6    laws of the Repealer States;

7    (f)    Whether the conduct of Defendants, as alleged in this complaint, caused

8    injury to the business or property of Plaintiff and Class members;

9    (g)    The effect of the alleged conspiracy on the prices of HDD suspension

10    assemblies sold in the United States during the Class Period;

11    (h)    The appropriate injunctive or other equitable relief for the Class; and

12    (i)    The appropriate classwide measure of damages for the Class and/or the

13    Repealer State Subclass.

14    105.    Plaintiff's claims are typical of the claims of Class members, and Plaintiff will

15    fairly and adequately protect the interests of the Class.  Plaintiff and all Class members were

16    similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices

17    for HDD suspension assemblies purchased indirectly from Defendants.

18    106.    Plaintiff's claims arise out of the same common course of conduct giving rise to

19    the claims of the other members of the Class.  Plaintiff's interests are coincident with, and not

20    antagonistic to, those of the other members of the Class and Subclass.  Plaintiff is represented by

21    counsel who are competent and experienced in the prosecution of antitrust, unfair competition,

22    and class action litigation.

23    107.    Class action treatment is a superior method for the fair and efficient adjudication

24    of the controversy, in that, among other things, such treatment will permit a large number of

25    similarly situated persons to prosecute their common claims in a single forum simultaneously,

26    efficiently and without the unnecessary duplication of evidence, effort and expense that

27    numerous individual actions would engender.  The benefits of proceeding through the class

28    mechanism, including providing injured persons or entities with a method for obtaining redress

CLASS ACTION COMPLAINT
CASE NO.

for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

108.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

## X.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of the Sherman Act
### 15 U.S.C. § 1

109.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

110.    Plaintiff brings this claim against all Defendants on behalf of the Class under federal law.

111.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

112.    Beginning as early as 2008 and continuing through the present, the exact starting date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially reducing or eliminating competition in the United States.

113.    In particular, defendants have combined and conspired to raise, fix, maintain, or stabilize the prices of HDD suspension assemblies.

114.    As a result of Defendants' unlawful conduct, prices for HDD suspension assemblies were raised, fixed, maintained, and stabilized in the United States.

115.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants.

CLASS ACTION COMPLAINT
CASE NO.

116.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(a)    exchanging information on prices charged for HDD suspension assemblies;

(b)    agreeing to raise, fix, and maintain prices for HDD suspension assemblies;

(c)    raising, fixing, and maintaining prices for HDD suspension assemblies;

(d)    submitting rigged bids for HDD suspension assemblies;

(e)    allocating markets and/or customers for HDD suspension assemblies; and

(f)    selling HDD suspension assemblies into and throughout the U.S. at supracompetitive prices.

117.    As a result of Defendants' unlawful conduct, Plaintiff and Class members have been injured in their businesses and property in that they have paid more for HDD suspension assemblies than they otherwise would have paid in the absence of Defendants' unlawful conduct.

118.    The alleged contract, combination or conspiracy is a per se violation of the federal antitrust laws.

119.    These violations are continuing and will continue unless enjoined by this Court.

120.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and Class members seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violations of the Cartwright Act**
**Cal. Bus. & Prof. Code § 16720 *et seq.***

121.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

122.    Plaintiff brings this claim against all Defendants on behalf of the Class, or alternatively the Repealer State Subclass, under California law.

CLASS ACTION COMPLAINT
CASE NO.

123.    A significant portion of Defendants' unlawful conduct was carried out in and aimed at California.  Defendants engaged in conspiratorial acts and communications within California, including at Defendant Headway's offices in Milpitas and at TDK's division in San Jose.  Further, the two dominant U.S. sellers of HDDs, Seagate Technology LLC ("Seagate") and Western Digital Corporation ("Western Digital"), are headquartered in California and within this District.  Seagate maintains its principal place of business in Cupertino, California, and Western Digital maintains its principal place of business in San Jose, California.  Due in part to these dominant downstream firms' locations within California, as well as California's status as the most populous state, Defendants' marketing and sale of HDD suspension assemblies targeted California more than any state.

124.    Application of California law to all U.S. purchases of finished goods containing HDD suspension assemblies manufactured or sold by a Defendant, or any current or former subsidiary of a Defendant, during the Class Period comports with the Due Process Clause given the significant aggregation of contacts between Defendants' illegal conspiracy and California.  All Defendants carried out conspiracy-related conduct in California and this conduct caused harm to California residents.

125.    A choice-of-law analysis also favors applying California antitrust law to return damages to all U.S. indirect purchasers of HDD suspension assemblies manufactured or sold by a Defendant or any current or former subsidiary of a Defendant.  California's interest in punishing antitrust violations occurring in California substantially outweighs any interest of any other state in denying recovery to its residents injured by out-of-state Defendants or applying its laws to conduct occurring outside its borders.  No Defendant is a resident of a non-Repealer State, and no state has an interest in preventing indirect purchasers within its borders from recovering from Defendants.

126.    California law should therefore apply nationwide.  Alternatively, California law should apply to the claims of all purchasers in the Repealer States.

127.    Defendants' conduct violates the Cartwright Act for the same reasons that it violates all of the state antitrust laws enumerated in the Third Claim for Relief, *infra*.

128.    Beginning at least as early as 2008 and continuing through the present, the exact dates being unknown to Plaintiff, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professional Code.  Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, allocate markets and rig bids for, HDD suspension assemblies.

129.    For the purpose of forming and implementing the alleged combinations, trust, agreements, understandings and concert of action, Defendants did those things they conspired to do, including but not limited to the acts alleged above, including:

(a)    exchanging information on prices charged for HDD suspension assemblies;

(b)    agreeing to raise, fix, and maintain prices for HDD suspension assemblies;

(c)    raising, fixing, and maintaining prices for HDD suspension assemblies; and

(d)    submitting rigged bids for HDD suspension assemblies;

(e)    allocating markets and/or customers for HDD suspension assemblies; and

(f)    selling HDD suspension assemblies into and throughout the United States, including California, at supracompetitive prices.

130.    The combination and conspiracy alleged herein has had the following effects, among others:

(a)    Price competition in the sale of HDD suspension assemblies has been restrained, suppressed and/or eliminated in California and throughout the United States;

(b)    Prices for HDD suspension assemblies sold by Defendants have been fixed, raised, maintained and stabilized at artificially high, supracompetitive levels in California and throughout the United States; and

(c)    Those who purchased HDD suspension assemblies indirectly from Defendants have been deprived of the benefit of free and open competition.

131.    As a direct and proximate result of the aforementioned illegal combination, trust, agreement, understanding and concert of action, Plaintiff and Class members have been injured in their business and property in that they paid more for HDD suspension assemblies than they otherwise would have paid in the absence of Defendants' unlawful conduct.

132.    As a result of Defendants' violations of Section 16720 of the California Business and Professions Code, Plaintiff seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## THIRD CLAIM FOR RELIEF
### Violations of State Antitrust Laws

133.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

134.    Plaintiff brings this omnibus claim against all Defendants on behalf of Repealer State Subclass members who made their relevant purchase(s) in Arizona, California, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

135.    For purposes of this omnibus claim, the law of the state in which each Repealer State Subclass member indirectly purchased one or more HDD suspension assemblies manufactured or sold by a Defendant, or by any co-conspirator or current or former subsidiary of a Defendant, applies to that transaction.

136.    Defendants' conduct in restraint of trade described herein violated the following laws:

(a)    Ariz. Rev. Stat. § 44-1401 *et seq.*

(b)    Cal. Bus. & Prof. Code § 16700 *et seq.*

(c)    D.C. Code § 28-4501 *et seq.*

(d)    Haw. Rev. Stat. § 480-4.

(e)    Iowa Code § 553.1 *et seq.*

(f)    Kan. Stat. Ann. § 50-101 *et seq.*

| | | |
|---|---|---|
| (g) | Me. Rev. Stat. Ann. tit. 10, § 1101 *et seq.* |
| (h) | Mich. Comp. Laws § 445.771 *et seq.* |
| (i) | Minn. Stat. § 325D.49 *et seq.* |
| (j) | Miss. Code Ann. § 75-21-1 *et seq.* |
| (k) | Neb. Rev. Stat. § 59-801 *et seq.* |
| (l) | Nev. Rev. Stat. § 598A.010 *et seq.* |
| (m) | N.H. Rev. Stat. Ann. tit. XXXI, § 356:1 *et seq.* |
| (n) | N.M. Stat. § 57-1-1 *et seq.* |
| (o) | N.Y. Gen. Bus. Law, § 340 *et seq.* |
| (p) | N.C. Gen. Stat. § 75-1 *et seq.* |
| (q) | N.D. Cent. Code § 51-08.1 *et seq.* |
| (r) | Or. Rev. Stat. § 646.705 *et seq.* |
| (s) | R.I. Gen. Laws § 6-36-1 *et seq.* |
| (t) | S.D. Codified Laws § 37-1-3.1 *et seq.* |
| (u) | Tenn. Code Ann. § 47-25-101 *et seq.* |
| (v) | Utah Code Ann. § 76-10-911 *et seq.* |
| (w) | W. Va. Code § 47-18-1 *et seq.* |
| (x) | Wis. Stat. § 133.01 *et seq.* |

137. Plaintiff and Repealer Class Members who made their relevant purchases in the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and these Class members paid more for finished goods containing HDD suspension assemblies than they otherwise would have paid in the absence of Defendants' unlawful conduct in restraint of trade. This injury is of the type the antitrust laws of the above states were designed to prevent, and it is an injury that flows from what makes Defendants' conduct unlawful.

138. Plaintiff and Repealer Class Members who made their relevant purchases in the above jurisdictions are accordingly entitled to damages, including statutory damages where applicable, to be trebled or otherwise increased as permitted by a particular jurisdiction's

antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above laws.

### FOURTH CLAIM FOR RELIEF
**Violations of State Unfair Competition Laws**

139.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

140.    Plaintiff brings this omnibus claim against all Defendants on behalf of Repealer State Subclass members who made their relevant purchase(s) in Arkansas, California, the District of Columbia, Florida, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, and West Virginia.

141.    For purposes of this omnibus claim, the law of the state in which each Repealer State Subclass member indirectly purchased one or more HDD suspension assemblies manufactured or sold by a Defendant, or by any co-conspirator or current or former subsidiary of a Defendant, applies to that transaction.

142.    Based on the foregoing, Defendants engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of the following laws:

(a)    Ark. Code Ann. § 4-88-101 *et seq.*

(b)    Cal. Bus. & Prof. Code § 17200 *et seq.*

(c)    D.C. Code § 28-3901 *et seq.*

(d)    Fla. Stat. § 501.201 *et seq.*

(e)    Haw. Rev. Stat. § 480-2.

(f)    Mass. G.L. c. 93A, § 1 *et seq.*

(g)    Mich. Comp. Laws Ann. § 445.901 *et seq.*

(h)    Minn. Stat. § 325F.68 *et seq.*

(i)    Mo. Rev. Stat. § 407.010 *et seq.*

(j)    Mont. Code, §§ 30-14-201 to -225.

CLASS ACTION COMPLAINT
CASE NO.

1    (k)    Neb. Rev. Stat. § 59-1602 *et seq.*

2    (l)    Nev. Rev. Stat. § 598.0903 *et seq.*

3    (m)    N.H. Rev. Stat. Ann. tit. XXXI, § 358-A *et seq.*

4    (n)    N.M. Stat. § 57-12-1 *et seq.*

5    (o)    N.Y. Gen. Bus. Law § 349 *et seq.*

6    (p)    N.C. Gen. Stat. § 75-1.1 *et seq.*

7    (q)    N.D. Cent. Code § 51-10 *et seq.*

8    (r)    Or. Rev. Stat. § 646.605 *et seq.*

9    (s)    R.I. Gen. Laws § 6-13.1-1 *et seq.*

10    (t)    S.C. Code Ann. § 39-5-10 *et seq.*

11    (u)    S.D. Codified Laws § 37-24 *et seq.*

12    (v)    Utah Code Ann. § 13-11-1 *et seq.*

13    (w)    Vt. Stat. Ann. tit. 9, § 2453 *et seq.*

14    (x)    Va. Code Ann. § 59.1-196 *et seq.*

15    (y)    W. Va. Code § 46A-6-101 *et seq.*

16    143.    As a direct and proximate result of Defendants' aforementioned unfair

17    competition or unfair, unconscionable, or deceptive acts or practices, Plaintiff and Repealer

18    State Subclass members who made their relevant purchases in the above jurisdictions have

19    suffered economic losses and are entitled to appropriate relief, including but not limited to

20    damages or restitution, as well as reasonable attorneys' fees, in an amount to be proven at trial.

21    144.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, certain of the Defendants have or will

22    be served with a demand letter, or such service of a demand letter was unnecessary because the

23    Defendant does not maintain a place of business within the Commonwealth of Massachusetts or

24    does not keep assets within the Commonwealth.

25    ///

26    ///

27    ///

28    ///

CLASS ACTION COMPLAINT
CASE NO.

XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) and direct that reasonable notice of this action, as provided under Rule 23(c)(2), be given to each member of the Class;

B.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

i.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

ii.    A per se violation of Section 1 of the Sherman Act;

iii.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of various states' antitrust and unfair competition laws as set forth herein;

C.    Plaintiff and members of the Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and the California Law Class or, alternatively, the Repealer State Subclass be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    Plaintiff and members of the Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

CLASS ACTION COMPLAINT
CASE NO.

F.      Plaintiff and members of the Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their inequitable acts;

G.      Plaintiff and members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiff and members of the Class have such other and further relief as the ca se may require and the Court may deem just and proper.

## XII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial of all issues so triable.

Dated:  August 14, 2019                    Respectfully submitted,

**GIRARD SHARP LLP**

*/s/ Christina C. Sharp*

Christina C. Sharp (SBN 245869)
Jordan Elias (SBN 228731)
Adam E. Polk (SBN 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT
CASE NO.